IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

ARLON SHANK,                          )
                                      )
             Plaintiff,               )
                                      )   Case No. 17-CV-446-JED-FHM
v.                                    )
                                      )
WHITING-TURNER CONTRACTING            )
COMPANY,                              )
                                      )
             Defendant.               )

**OPINION & ORDER**

Before the Court is Defendant Whiting-Turner Contracting Company ("Whiting-Turner")'s *Daubert* Motion to Exclude Plaintiff's Lost Earnings Opinions. (Doc. 53). Plaintiff has submitted a response (Doc. 56), and Whiting-Turner has submitted a reply (Doc. 60).

**I.    Background**

This is a slip and fall case in which Plaintiff alleges that he sustained serious injury after tripping at his work site on May 5, 2015. Plaintiff has retained an expert, Dr. Ralph D. Scott, Jr., to testify as to the economic losses suffered by Plaintiff as a result of his injury. Dr. Scott, an economist, calculated that Plaintiff suffered a past loss of $233,420.53 and will suffer a loss in earning capacity in the range of $534,160.29 to $632,469.86. (Doc. 53-4 at 2). He further calculated that Plaintiff suffered a past loss of fringe benefits of $98,469.80 and will suffer a future loss of fringe benefits in the range of $283,154.69 to $335,267.92. (*Id*. at 6). In total, Dr. Scott concluded that Plaintiff's overall economic loss would be between $1,149,205.32 and $1,299,628.11. (*Id*. at 1, 6).

## II. Standards Governing Expert Testimony

Rule 26(a)(2) of the Federal Rules of Civil Procedure describes the mandatory disclosures parties must make concerning expert testimony. Under Rule 26(a)(2)(A), a party must disclose to the other parties the identity of any expert witness it may use at trial. Rule 26(a)(2)(B) then describes the written report that must accompany any Rule 26(a)(2)(A) disclosure. This written report must contain:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
>
> (ii) the facts or data considered by the witness in forming them;
>
> (iii) any exhibits that will be used to summarize or support them;
>
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
>
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
>
> (vi) a statement of the compensation to be paid for the study and testimony in the case.

Fed. R. Civ. P. 26(a)(2)(B).

A district court may only allow evidence violating Rule 26(a) if the violation was justified or harmless. *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002). In determining whether a violation was justified or harmless, courts should consider the following factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).

Moving beyond procedural requirements, Rule 702 of the Federal Rules of Evidence provides important substantive requirements for the admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 597 (1993), the Supreme Court held that district courts act in a "gatekeeping role" to ensure that scientific expert testimony is relevant and reliable. An expert's opinion must be based on "more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590. The applicability of *Daubert* was later expanded to apply to the opinions of all experts, not just scientific experts. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) ("We conclude that *Daubert's* general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge.").

The Supreme Court set forth several non-exclusive factors that a court may consider in making its determination whether proposed expert testimony will assist the trier of fact: (1) "whether it can be (and has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) the "known or potential rate of error" of a technique; and (4) whether the theory or technique has "general acceptance," which is an important consideration

because "'a known technique which has been able to attract only minimal support within the community' may properly be viewed with skepticism." *See Daubert*, 509 U.S. at 593-94. The inquiry into these factors is "a flexible one," and the focus is "on principles and methodologies, not on the conclusions that they generate." *Id.* at 593.

In *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227 (10th Cir. 2005), the Tenth Circuit discussed the role of district courts when considering a *Daubert* challenge. The court should make a preliminary finding whether the expert is qualified, by determining "if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" 400 F.3d at 1232-33 (quoting *Daubert*, 509 U.S. at 592). The proponent of expert testimony must establish that the expert used reliable methods to reach his conclusion and that the expert's opinion is based on a relevant factual basis. *See id.* at 1233. "[A] trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." *Id.* However, an impermissible analytical gap in an expert's methodology can be a sufficient basis to exclude expert testimony under *Daubert. See id.*; *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 886 (10th Cir. 2005). "Neither *Daubert* nor the Federal Rules of Evidence 'require[ ] a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.'" *Norris*, 397 F.3d at 886 (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

**II.     Analysis**

It is clear from the tables included as part of Dr. Scott's report that he utilized historical data showing Plaintiff's income from shortly after Plaintiff's injury to the present in order to estimate Plaintiff's projected income until retirement. (*See* Doc. 53-4 at 4). Because Plaintiff only made approximately $26,000 from June 1, 2017, to May 31, 2018, Dr. Scott assumes Plaintiff will

4

only make $26,000 per year—much less than his projected annual income of approximately $85,000 as a union electrician—for the rest of his working life. (*Id.*). Because the post-injury historical data shows no earned fringe benefits, Dr. Scott assumes that Plaintiff will continue to earn no fringe benefits. (*Id.* at 5). In other words, a basic assumption of Dr. Scott's opinions is that Plaintiff is permanently impaired—that his limited earnings from the past few years since his injury can be extrapolated into the future until retirement.

One of the primary arguments in Defendant's Motion to Exclude is that Plaintiff's expert lacks a foundation to assume permanent disability. In response, Plaintiff points to five pieces of evidence that, he asserts, serve as the foundation for Dr. Scott's economic calculations of diminished wages and fringe benefits:

- A July 15, 2016, order by an administrative law judge (ALJ) of the Oklahoma Workers' Compensation Commission authorizing medical treatment for Plaintiff (Doc. 56 at 15-18) ("Exhibit 1");

- A July 3, 2017, pleading submitted to the Workers' Compensation Commission by Plaintiff's employer, P1 Group, Inc. (*id.* at 19) ("Exhibit 2");

- Reports from June and July 2017 by Antoine Jabbour, M.D., an independent medical examiner appointed by the Workers' Compensation Commission (*id.* at 20-24) ("Exhibit 3");

- October 11, 2017, post-operation notes by Jason Joice, M.D. (*id.* at 25-31) ("Exhibit 4"); and

- A Joint Petition for Settlement of Plaintiff's workers' compensation claim filed on March 2, 2018 (*id.* at 32) ("Exhibit 5").

Plaintiff claims that "[f]rom these facts and records and summaries thereof, Dr. Scott knew that [Plaintiff] had been unable to work . . . for the two years following June 15, 2015 (the date of [Plaintiff's] first shoulder surgery)." (Doc. 56 at 7-8). Plaintiff goes on to state that "[f]rom these facts and records, Dr. Scott knew that Plaintiff has only worked intermittently during the third and fourth years post-injury." (*Id.* at 8). According to Plaintiff, Dr. Scott also "knew that the workers'

5

compensation commission had entered an order fixing the degree of Plaintiff's permanent partial disability at 30.5% to the 'whole person.'" (*Id*.). Therefore, Plaintiff asserts, "Dr. Scott had sufficient basis to make lost wage calculations based on the likelihood that Mr. Shank will never work as a union electrician again." (*Id*.).

Yet, these materials identified in Plaintiff's response brief were not cited anywhere in Dr. Scott's written report. On the first page of his report, Dr. Scott states that "[b]ecause of his injury, [Plaintiff] has been deprived of a flow of income that he could have otherwise generated." (Doc. 53-4 at 1). He then goes on to describe the mathematical calculations he used—all of which depend on the assumption that Plaintiff has a permanent impairment. If Dr. Scott relied on the aforementioned materials to inform his opinions concerning Plaintiff's economic losses, these materials needed to be identified in his written report pursuant to Rule 26(a)(2)(B).

"Before an attorney can even hope to deal on cross-examination with an unfavorable expert opinion he must have some idea of the bases of that opinion and the data relied upon." *Smith v. Ford Motor Co.*, 626 F.2d 784, 794 (10th Cir. 1980) (quoting Jack H. Friedenthal, Discovery and Use of an Adverse Party's Expert Information, 14 Stan. L. Rev. 455, 485 (1962)). The federal rules regarding expert witness designations are meant "to take the guesswork out of expert testimony for all parties involved in litigation." *Addleman v. Keller Transp., Inc.*, No. 13-CV-230-S, 2014 WL 10222534, at *3 (D. Wyo. Dec. 9, 2014). "Parties are entitled to a *timely* and *detailed* description of what the witnesses relied upon in forming *each* particular opinion so the opposing party may adequately prepare discovery for the deposition and cross-examination of the witness at trial." *Id*. (emphasis in original). In this case, Plaintiff's own response brief suggests that Dr. Scott considered a lot of material that is not cited in his report.

Typically, the Court would conduct an analysis using the *Woodworker's Supply* factors to determine whether Dr. Scott's testimony should be allowed despite his incomplete report. *Jacobsen*, 287 F.3d at 953. However, in this case, the Court finds that such an analysis is unnecessary because Dr. Scott's opinions must be excluded under Fed. R. Evid. 702 and *Daubert*. Pursuant to Rule 702, an expert witness's testimony must be "based on sufficient facts or data." Fed. R. Evid. 702(b). Here, even if the Court assumes Dr. Scott considered the facts and data identified in the Plaintiff's response brief, these facts and data are insufficient to serve as a foundation for his opinions.

Exhibit 1, the order authorizing medical treatment, merely shows that a motion by Plaintiff's employer before the Workers' Compensation Commission to terminate Plaintiff's *temporary total* disability benefits was denied and the employer was mandated to provide medical treatment, including surgery, for Plaintiff's right shoulder. (Doc. 56 at 17). This order does not provide any information as to whether Plaintiff's injury is permanent and will limit his earning capacity indefinitely. Exhibit 2, the Workers' Compensation pleading, also only concerns *temporary total* disability benefits. (*Id*. at 19).

The medical reports by Dr. Jabbour, Exhibit 3, discuss whether or not Plaintiff needed to have a third surgery on his right shoulder. (*Id*. at 20-24). Ultimately, in a letter dated July 6, 2017, Dr. Jabbour expressed his opinion that Plaintiff should undergo "a third and hopefully final shoulder surgery." (*Id*. at 24). Dr. Jabbour does not give an opinion on whether Plaintiff will suffer a permanent disability as a result of the initial injury. Exhibit 4, the post-operation notes, state that Plaintiff's work status is "light work/activity," but that his status is "improving." (Doc. 56 at 27). The "Work Status Report" restricts Plaintiff from using his right shoulder and arm, but an end date of November 11, 2017, is provided for those restrictions. (*Id*. at 26).

The only exhibit to mention permanent disability is Exhibit 5, the Joint Petition for Settlement. This document, filed with the Workers' Compensation Commission, states that Plaintiff's employer and/or the employer's insurance carrier will pay $34,513.50 "for permanent partial disability (aprx 30.5%)." (*Id.* at 32). However, this document merely represents the settlement terms agreed to by Plaintiff, his employer, and the employer's insurance carrier. *See Okla. Stat.* tit. 85A, § 115(A) ("If the employee and employer shall reach an agreement for the full, final and complete settlement of any issue of a claim pursuant to this act, a form designated as 'Joint Petition' shall be signed by both the employer and employee, or representatives thereof, and shall be approved by the Workers' Compensation Commission or an administrative law judge, and filed with the Commission."). The Court finds that this settlement agreement alone is not sufficient to support Dr. Scott's crucial assumption that Plaintiff's recent earnings represent the limit of his earning capacity for the rest of his career.[1] Without a proper basis for that assumption, Dr. Scott's opinions are too speculative to pass muster under *Daubert*. *See McClain v. Metabolife Int'l*, 401 F.3d 1233, 1237 (11th Cir. 2005) ("*Daubert* requires the trial court to act as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury.").

For the foregoing reasons, Defendant Whiting-Turner's Motion to Exclude is **granted**. Dr. Scott will be excluded from testifying at trial.

SO ORDERED this 19th day of December, 2018.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE

---

[1] Plaintiff also points to Whiting-Turner's experts' findings as supporting the conclusion of permanent impairment. (Doc. 56 at 8-9). However, Plaintiff does not suggest that Dr. Scott was provided these materials in advance of preparing his own report. As such, the Court is unable to treat these findings as bases of Dr. Scott's opinions.